JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Lisa Hall ("Hall"), appeals her conviction. Finding no merit to the appeal, we affirm.
 {¶ 2} This appeal arises out of the criminal prosecution of Hall, her mother Joan Hall ("Joan"), and Joan's boyfriend, Roger Neff ("Neff").[1] In 2005, the three defendants were charged with one count of aggravated theft and one count of receiving stolen property. A superseding indictment was filed in January 2006. Joan was indicted on fifty-two counts of forgery, eighteen counts of tampering with records, and one count each of possessing criminal tools, theft of property over $1 million, illegal use of food stamps, Medicaid theft, engaging in a pattern of corrupt activity pursuant to Ohio's RICO statute, and money laundering. Neff was charged with engaging in a pattern of corrupt activity, two counts of tampering with records, and one count each of possessing criminal tools and theft of property over $1 million. Hall was charged with four counts of tampering with records and one count each of engaging in a pattern of corrupt activity, theft of property over $1 million, receiving stolen property, and money laundering.
 {¶ 3} After numerous pretrials and motion hearings, the three defendants waived their right to a jury trial, and a six-week bench trial ensued at which fifty-two witnesses testified for the State and 128 exhibits were admitted into evidence.
 {¶ 4} The following evidence was adduced at trial. *Page 4 
 {¶ 5} The evidence showed that Joan was involved in a massive retail fraud scam that spanned twenty-nine states and a period of at least fifteen years. The scheme involved Joan, and sometimes Neff, going to various retailers to illegally return clothes, jewelry, and other household items. Joan employed many methods to return goods including using counterfeit receipts, switching price tickets, taking merchandise off store shelves and returning it with altered or counterfeit receipts, and telling store employees hardship stories. Joan would then convince store employees to refund the money to her credit or debit cards. For example, during one six-year period, over $313,000 was charged back to credit and debit card accounts belonging to Joan and Neff.
 {¶ 6} In October 2005, Detective Chuck Duffy of the Richmond Heights police was contacted by the manager of investigations for Sears, who reported that the store's loss prevention software flagged close to $20,000 in returns on credit and debit cards issued to Joan and Neff. Det. Duffy went to Joan's house to investigate. Neff was home and saw the detective through the screen door. Neff told the detective he had nothing to say and slammed the door. Det. Duffy observed a room full of merchandise and numerous shopping bags inside the home.
 {¶ 7} Det. Duffy then received a phone call from Hall, who identified herself as Joan's daughter and told the detective that she would come to Ohio from her home in Kentucky to bring her mother in to talk to him. She told him that her mother was on public assistance and had large medical bills. *Page 5 
 {¶ 8} Det. Duffy arrested Joan a week later and executed a search warrant at her Westlake home. The detective described the home as a "retail merchandise factory," observing that the entire house was full of merchandise, pricing equipment, and thousands of store receipts. The police also confiscated $50,000 in cash, bank and investment account statements, multiple credit cards, and the contracts and keys to five safety deposit boxes.
 {¶ 9} The day after Joan's arrest, Hall went to Ohio Savings Bank and tried to have her mother's name taken off two safety deposit boxes. Hall lied to the bank employee, stating that the keys to the boxes were in Kentucky, when in actuality Det. Duffy had confiscated the keys. When told that she could not have her mother's name removed from the boxes, Hall told the bank employee that she wanted the boxes to be drilled out and new ones replaced in her name. The next day, Joan attempted to access the safety deposit boxes at two banks, stating that her keys had been stolen when her house was robbed. One bank manager testified that Joan was upset when she learned that she could not access her boxes immediately.
 {¶ 10} The police obtained search warrants for the safety deposit boxes and confiscated over $1,280,000, financial statements from investment groups, assorted jewelry, and a handgun. The two safety deposit boxes at one bank where Hall had attempted access contained $199,000, the handgun, 274 boxes of jewelry, annuity statements, and miscellaneous papers.
 {¶ 11} Priscilla Polomsky of Ohio Savings Bank testified that Hall and her mother came into the bank to rent two safety deposit boxes in July 2004. Joan was *Page 6 
carrying two heavy shopping bags that she claimed contained manuscripts for a book she was writing. Hall and her mother spent over thirty minutes placing items in the safety deposit boxes. Joan returned the next day to access the safety deposit boxes, but neither woman returned to access the boxes until after Joan was arrested.
 {¶ 12} Shortly after her mother's arrest, Hall also transferred $80,000 from a joint bank account.
 {¶ 13} A week later, police executed another search warrant at Joan's house, accompanied by TJ Maxx investigators. The TJ Maxx investigators identified merchandise from their store and filled two large U-Haul trucks with the confiscated goods. One of the investigators, William Dammarell, had a two-hour conversation with Joan, during which she admitted that she had been shoplifting since the 1970's, explained her system of returning merchandise, admitted making millions in refunds, and stated that she wanted to write a book, become a speaker, and go on television. She also asked if TJ Maxx would be willing to hire her.
 {¶ 14} The police also discovered that Joan was receiving public assistance in the form of food stamps and social security disability and found Hall's signature on the social security forms attesting to her mother's indigent status.[2] Hall was also the payee for the social security funds. *Page 7 
 {¶ 15} Hall's brother, Bradley Hall ("Bradley"), testified that Hall admitted to him that from 1992 to 2005 she received large sums of cash from their mother that Joan had obtained illegally. He claimed Hall used the funds to finance her house-flipping business and to purchase property in Kentucky and California, including one house in San Francisco that cost $1.2 million. She would renovate the house, Bradley testified, to get their mother's stolen money "into the system."
 {¶ 16} Bradley further testified that Hall told him that she had set up an account in the Maricopa Investment hedge fund with Joan's stolen money. Hall had asked Bradley to open a Charles Schwab account in his name with $400,000 she would give him, telling him that she was being sued and was trying to hide the money. He testified that her plan was to have him gradually withdraw the money from the account and put it into another account in his name so that she could hide the money. Bradley refused to open the account, but his name was put on the account without his knowledge, and his name was also placed on a bank account in Kentucky that was linked to his sister's address.
 {¶ 17} According to Bradley, Joan gave much of the money she obtained through the refund scheme to Hall, and Hall would then take the money and invest it. Bradley testified that Hall told him she wanted to invest their mother's money because throughout their history their mother would make money and then lose it and that "someone was going to have to take care of her, and *** I have the investment [and] banking knowledge to do it, do it safely, and securely, and efficiently, and it wouldn't be lost" but that "she wasn't doing it for free." *Page 8 
 {¶ 18} Bradley stated that his mother and sister "offered him a piece of the action" if he signed on to the Charles Schwab account, helped with the purchase of houses in Kentucky, or if he would keep some of his mother's property at his house. He further testified that his mother's and sister's independent investment firm, Intercontinental Management, was a "front" for laundering Joan's stolen money and that they asked him to get involved but he declined.
 {¶ 19} David Mobley ("Mobley"), who was convicted in Florida for operating the fraudulent Maricopa Investment hedge fund ("Maricopa"), testified that he first met Hall in 1994 when she invested in Maricopa. He testified that he met Joan in 1995 when she wanted to invest money. During one conversation, Joan told Mobley that she received the investment money from both her divorce settlement and the refund scheme.
 {¶ 20} Mobley stated that he received large sums of money from Hall, her mother, and Sanford Frumker, another one of Joan's boyfriends. He testified that Hall and her mother invested $2.5 million in Maricopa.
 {¶ 21} Mobley testified that in 1997, Hall informed him that she needed to make substantial withdrawals from Maricopa for real estate purchases. Hall explained to him that she would hire contractors to renovate her properties and pay them in cash to legitimize her mother's money. She explained that by doing this, she would convert her mother's money into legitimate capital gains in real estate once the flipped property was sold. *Page 9 
 {¶ 22} He also testified that Hall told him about her financial dealings in offshore accounts and specifically how she structured the off-shore account in the Isle of Man and that he had knowledge of Joan's off-shore bank accounts.
 {¶ 23} Mobley described another incident that occurred in 1997 when Hall asked him to launder $300,000 of her mother's cash. Hall met Mobley in the Bahamas where she gave $300,000 in cash. A few weeks later Hall contacted Mobley and asked him to meet her back in the Bahamas to pick up the money because her mother was nervous. Mobley then suggested that Hall invest that money with one of Maricopa's subsidiaries. He testified he went to Kentucky to pick up the money from Hall.
 {¶ 24} Mobley testified that he paid Hall and her mother approximately $300,000 in referral fees for the investors they brought to his company. Finally, Mobley discussed the 2002 deposition that he gave to Florida authorities, almost three years prior to the defendants' arrests, in which he told investigators that Hall had admitted to him that the source of her investment funds was her mother's refunding business.
 {¶ 25} As it pertains to Hall, Det. Duffy testified that he executed a search warrant at Hall's Kentucky home, retrieving documents that showed how she created balance sheets for her mother's assets and which tracked her mother's money and the investing of those funds. He also discovered that Hall had little verifiable income, and Joan had given her over $500,000. *Page 10 
 {¶ 26} The trial court convicted Hall of the RICO violation, receiving stolen property, and money laundering. Joan was convicted of fifty counts of forgery, eighteen counts of tampering with records, one count of illegal use of food stamps, the RICO violation, possessing criminal tools, theft of property over $100,000, Medicaid theft, and money laundering. Neff was convicted of the RICO violation, possessing criminal tools, and theft of property over $100,000.
 {¶ 27} Extensive post-trial motion, sentencing, and forfeiture hearings were conducted.[3] Hall was sentenced to three years in prison. Her mother was sentenced to seven years in prison, and Neff was sentenced to three years in prison.
 {¶ 28} Hall appeals, raising six assignments of error for our review.
 I. Prosecutorial Misconduct {¶ 29} In the first and sixth assignments of error, Hall argues that the trial court erred in entering a judgment of conviction when there was "prejudicial prosecutorial misconduct."
 {¶ 30} The test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and prejudicially affected the substantial rights of the defendant. State v. Lott (1990),51 Ohio St.3d 160, 165, 555 N.E.2d 293, cert. denied, 498 U.S. 1017,112 L.Ed.2d 596. A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v.Apanovitch (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394. *Page 11 
 {¶ 31} Within these assignments of error, Hall accuses the State of withholding discoverable material, procuring search warrants and indictments through false representations, inducing witnesses to lie, and introducing into evidence prejudicial extraneous matters.
 a. Discoverable Material {¶ 32} The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland (1963), 373 U.S. 83, 84, 83 S.Ct. 1194,10 L.Ed.2d 215; see, also, State v. Johnston (1988), 39 Ohio St.3d 48,60, 529 N.E.2d 898. Ohio law requires a prosecuting attorney, upon motion of the defendant before trial, to disclose to the defendant all known evidence "favorable to the defendant and material to either guilt or punishment." Crim. R. 16(B)(1)(f). The Brady court spoke of such evidence as that which "would tend to exculpate" the defendant.Brady, at 88.
 {¶ 33} Suppression of exculpatory evidence by the prosecution violates due process only where that evidence creates a reasonable doubt as to the guilt of the accused. Wagster v. Overberg (6th Cir. 1977),560 F.2d 735, 739. The mere possibility that the evidence might have helped the defense does not establish "materiality." Id. at 741.
 {¶ 34} The Ohio Supreme Court declared that "the key issue in a case where exculpatory evidence is alleged to have been withheld is whether the evidence is *Page 12 
material." Johnston, at 60. The court noted that such evidence will be deemed material only if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. at 61 (quoting United States v.Bagley (1985), 473 U.S. 667, 87 L.Ed.2d 481, 105 S. Ct. 3375); see, also, Apanovitch. The Bagley court noted that a "reasonable probability" is one sufficient to undermine confidence in the outcome. Id. at 682; see, also, Apanovitch, at 92. Moreover, a reviewing court should consider the cumulative effect of all nondisclosures in determining whether reversal is required. Kyles v. Whitley (1995), 514 U.S. 419,131 L.Ed.2d 490, 115 S.Ct. 1555. Whereas each bit of omitted evidence, standing alone, may not be sufficiently material to justify a new trial, the net effect, however, may warrant a new trial. Id. at 434.
 {¶ 35} Hall claims that exculpatory documentary evidence was withheld before and during the trial that demonstrated that many of Joan's assets were derived from lawful sources. Specifically, Hall argues that the State withheld documents showing payments that one of Joan's boyfriends, Sanford Frumker, made to her during the same time Hall was investing her mother's money. Hall claims that she became aware of these records only when the State returned them to her as part of the personal papers that the court ordered returned after the trial.
 {¶ 36} During the hearing on Hall's motion for the new trial, the State argued that the Frumker documents had been in the possession of police for the last eighteen months, and defense counsel had been afforded the opportunity to *Page 13 
examine the documents. The trial court ruled that it was defense counsel's duty to examine documents made available to them.
 {¶ 37} Although Hall continues to argue that the State withheld exculpatory discovery material, we find that there is no evidence that the State suppressed the Frumker documents. Det. Duffy averred that all of the evidence in the case was kept in either a locked storage facility or at the police department. At the police department, the jewelry and currency were stored in the evidence locker, and boxes of papers and receipts were stored in the detectives' office near Det. Duffy's desk. Det. Duffy averred that defense counsel was allowed full access to all of the stored items. After the trial, the court ordered the police to return some of Hall's and her mother's personal property. It was in one of these returns that defense attorneys discovered the Frumker documents.
 {¶ 38} There is no requirement that the State point out specific information that a defendant argues is exculpatory, so long as the State gives defense counsel access to that information. Although defense counsel claimed that the documents were withheld, Det. Duffy and two sergeants averred to the chain of custody, how the documents were stored, and how defense counsel had access to all of the evidence. We do not find that the trial court abused its discretion in determining that the State did not withhold exculpatory information.
 {¶ 39} Moreover, assuming arguendo that the State had "withheld" the Frumker documents, we find no due process violation. Based on the voluminous record before us, we find no reasonable probability that the outcome of the trial *Page 14 
would have been different had the defense received or found the Frumker documents. See State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128,767 N.E.2d 166. The allegations at trial were that Hall took her mother's money and laundered it in various ways. Even if some of her mother's money was legitimate, having been given to her by Frumker, that does not negate the evidence that Hall had knowledge that at least some of her mother's money that she invested for her was from illegitimate sources.
 {¶ 40} Finally, Hall argues that there "were other discovery abuses," but she fails to point to the place in the record where these other alleged abuses occurred. Because it is not this court's function to make Hall's arguments for her, we will not attempt to ferret out an alleged "discovery abuse" within 6,300 transcript pages.
 {¶ 41} Although it is true that the State turned over numerous documents to the defense mid-trial, the record shows that the majority of the documents were syntheses of documents previously turned over to counsel that were generated to assist the trier of fact and the parties with understanding the volume of evidence against the defendants. The record also shows that the rest of the documents in dispute were not in the State's possession previous to cross-examination of one of the State's witnesses. Additionally, the court afforded defense counsel adequate continuances to examine the new material. Although it was argued at trial that no continuance would be sufficient to remedy the State's "failure" to turn over all discoverable material, we find no abuse of the court's discretion in determining that a continuance would remedy any discovery violation. *Page 15 
 b. False Representations {¶ 42} In her sixth assignment of error, Hall claims that false representations were made in order to procure a "key search warrant." Not only does she fail to indicate which of the multiple search warrants she is referring to, she also fails to support this allegation with any evidence. Moreover, we find no record of Hall's moving to suppress any of the search warrants.[4]
 c. Witness Tampering {¶ 43} Hall next argues that the State tampered with a key witness in the case, David Mobley, by urging him to lie at trial. Specifically, Hall alleges that the State "belatedly produced" tape recordings and transcripts of a meeting between Det. Duffy and Mobley in which the detective encouraged Mobley to testify falsely or fabricate evidence against Hall.
 {¶ 44} Again, Hall fails to cite to that part of the record on which she bases her argument. Pursuant to App. R. 12(A)(2), we may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App. R. 16(A). The appellant must include in her brief "an argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on *Page 16 
which appellant relies." App. R. 16(A). Although we are cognizant of the fact that the transcript in this case exceeds 6,300 pages, it is the voluminous nature of the transcript that exemplifies why adherence to the appellate rules is necessary. Moreover, it is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error. State v. McGuire (Apr. 15, 1996), Preble App. No. CA95-01-001.
 {¶ 45} That being said, our review of the entire record shows no evidence that Det. Duffy encouraged or even implied that Mobley should testify falsely or fabricate evidence. In fact, although there is some discussion of this alleged incident during the trial, the tape recording of Det. Duffy's conversation with Mobley was withdrawn from evidence by Hall's counsel.
 d. "Cafeteria-gate" {¶ 46} Finally, Hall argues that the media attention that the trial generated prejudiced her and deprived her of a fair trial. She also claims that mid-trial publication of reports that her codefendants had stolen food from the Justice Center cafeteria during a lunch break so prejudiced her that she did not receive a fair trial. Hall alleges that her codefendants' alleged theft during trial had serious adverse consequences because Hall was "lost in the shuffle of guilt by association."
 {¶ 47} This court held in State v. King (Feb. 1, 2001), Cuyahoga App. No. 77566, that: "[i]n a bench trial, the trial court is presumed to rely on only relevant, material evidence in arriving at its judgment," citing State v. Williams (Oct. 12, 2000), Cuyahoga App. No. 77153;State v. Lane (1995), 108 Ohio App.3d 477, *Page 17 671 N.E.2d 272. "Therefore, we assume that the trial court, as trier of fact, relied on relevant, material evidence in making its determination of guilt." King.
 {¶ 48} As the trier of fact, the judge is presumed to disregard any prejudicial testimony when making a decision. Hall has failed to show how she was prejudiced by the admission of the circumstances surrounding her codefendants' mid-trial theft. Furthermore, given no concrete evidence to the contrary, we presume that the trial judge relied on only relevant evidence in finding Hall guilty.
 {¶ 49} We find no misconduct by the State that warrants a reversal in this case. Therefore, the first and sixth assignments of error are overruled.
 II. Joinder of Codefendants {¶ 50} In the second assignment of error, Hall argues that the trial court erred in denying her motion for a separate trial.
 {¶ 51} It is well established that the law and public policy generally favor the joinder of charges and defendants which involve the same acts, transactions, or course of criminal conduct. See, e.g., Crim. R. 8(B), Crim. R. 13, and State v. Dunkins (1983), 10 Ohio App.3d 72,460 N.E.2d 688. Relief from such joinder is available under Crim. R. 14 upon a demonstration of prejudice by the defendant. State v. Owens (1975),51 Ohio App.2d 132, 366 N.E.2d 1367.
 {¶ 52} For an appellate court to reverse a trial court's ruling denying severance, the defendant must demonstrate that the trial court abused its discretion. Lott. An abuse of discretion means more than simply an error of law or an error in *Page 18 
judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980),62 Ohio St.2d 151, 404 N.E.2d 144.
 {¶ 53} A defendant's right to cross-examination, secured by the confrontation clause of the Sixth Amendment, is violated in a joint trial with a codefendant who does not testify, by the admission of the codefendant's statements inculpating the defendant, even where the jury is instructed that the codefendant's statement is to be disregarded in determining the defendant's guilt or innocence. Bruton v. UnitedStates (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. Thus, aBruton problem arises in a joint trial of two or more defendants when the trial court admits into evidence a confession or statement by a nontestifying defendant that implicates the other defendant(s) in criminal activity. In this case, Hall complains that her mother's statements to David Mobley and a TJ Maxx investigator implicated her in her mother's crimes. But Joan's statements never mentioned or even alluded to any involvement by Hall, except at one point when Joan told the investigator that her daughter was not involved.
 {¶ 54} Joinder of the three defendants for trial was also proper because they acted in concert and participated in the same criminal enterprise. Crim. R. 8(B). The various offenses charged in the indictments are part of the defendants' participation in a common scheme or plan, and the same course of criminal conduct. Under these circumstances the law favors joinder. Crim. R. 8.
 {¶ 55} Hall also argues that her defense was antagonistic to that of her mother's and claims that the antagonism arose as a combination of Joan's out-of-court *Page 19 
statements, Joan's election not to testify, and the prosecution's theory that all of Joan's money was stolen. Based on Hall's argument, the antagonism did not occur until after the State rested and Joan decided not to testify and after trial, when Hall "discovered" that some of her mother's money came from Frumker. Thus, Hall would have this court reverse on the theory that the trial court should somehow have foreseen the events that would occur at and after trial and known that the defenses would become antagonistic. We find no merit to that argument.
 {¶ 56} Finally, Hall argues that because of the trial court's refusal to sever her trial from her mother's, she was left with the "Draconian" decision to either defend herself or contribute to her mother's humiliation and she should not have to make that choice.[5] Certainly, Hall is not the first defendant to be tried with a parent. The trial court's verdict demonstrates that it considered each charge and each defendant separately, i.e., finding Hall not guilty of theft and tampering with records and finding her guilty of the RICO charge, money laundering, and receiving stolen property. We do not find that the trial court abused its discretion in refusing to sever the defendants' trials.
 {¶ 57} Therefore, the second assignment of error is overruled.
 III. Indictment and Bill of Particulars *Page 20 {¶ 58} In the third assignment of error, Hall argues that the trial court erred in failing to dismiss charges against her due to a vague indictment and bill of particulars.
 {¶ 59} A criminal indictment serves several purposes. First, by identifying and defining the offenses of which the individual is accused, the indictment serves to protect the individual from future prosecutions for the same offense." State v. Childs, 88 Ohio St.3d 194,198, 2000-Ohio-298, 724 N.E.2d 781, citing State v. Sellards (1985),17 Ohio St.3d 169, 170, 478 N.E.2d 781. "In addition, the indictment compels the government to aver all material facts constituting the essential elements of an offense, thus affording the accused adequate notice and an opportunity to defend." Id.
 {¶ 60} The purpose of a bill of particulars is "to elucidate or particularize the conduct of the accused alleged to constitute the charged offense," and inform the accused of the exact nature of the charges against her so that she can prepare her defense. Sellards; Statev. Fowler (1963), 174 Ohio St. 362, 364, 189 N.E.2d 133. "The purpose of a bill of particulars is to set forth specifically the nature of the offense charged, not to require the state to disclose its evidence."State v. Chaffin (1972), 30 Ohio St.2d 13, 282 N.E.2d 46, paragraph one of the syllabus.
 {¶ 61} Thus, an indictment serves to commence the criminal prosecution of a defendant by averring the essential elements of the indicted offense, while a bill of particulars serves to inform the defendant of the specific conduct alleged to constitute the indicted offense.Sellards. *Page 21 
 {¶ 62} When presented with a motion to dismiss an indictment, a trial court looks only to the face of the indictment to determine whether it is legally sufficient and complies with other requirements. SeeState v. Tipton (1999), 135 Ohio App.3d 227, 733 N.E.2d 634, appeal not allowed, 88 Ohio St.3d 1416, 723 N.E.2d 121 (holding that, "[w]hen a defendant in a criminal action files a motion to dismiss which goes beyond the face of the indictment, he is, essentially, moving for summary judgment," which is not permitted under the Ohio Rules of Criminal Procedure). On the other hand, challenges to a bill of particulars are generally based on the argument that the bill of particulars was not specific enough, such that the defendant was not informed of the precise nature of the offense. See, e.g., State v.Lewis (1993), 85 Ohio App.3d 29, 619 N.E.2d 57; State v. O'Donnell, Scioto App. No. 00 CA2724, 2001-Ohio-2472. To prevail on such a challenge, however, an appellant must show that she was prejudiced (i.e., the lack of specificity prevented the defendant from adequately preparing or presenting a defense). Id.; See, also, State v.Brumback (1996), 109 Ohio App.3d 65, 671 N.E.2d 1064. Whether a bill of particulars provides greater detail to the charge contained in the indictment is a matter left to the sound discretion of the trial judge, and will not be overturned absent an abuse of that discretion.Lewis, citing State v. Clay (1972), 29 Ohio App.2d 206,58 Ohio Op.2d 364, 280 N.E.2d 385.
 {¶ 63} Therefore, our analysis centers on whether the trial court abused its discretion in overruling Hall's motion for a more specific bill of particulars. See State v. Butcher, Stark App. No. 2001CA00270, 2002-Ohio-3689. *Page 22 
 {¶ 64} In this case, Hall was charged with a total of eleven counts of forgery, a RICO violation, receiving stolen property, and money laundering. Contemporaneously with the filing of the bill of particulars, the State provided Hall with discovery, which included a matrix of each charge and a witness list. Furthermore, the bill of particulars explained the specific circumstances of the alleged criminal conduct that occurred over a span of time.
 {¶ 65} We find, in accordance with Sellards, that each of the events were specifically identified and each of the eleven multi-year time periods are sufficiently responsive in this case. This is especially true in light of Hall's role in the enterprise in that she was responsible for laundering her mother's money and ran the accounting and financial aspects of the enterprise.
 {¶ 66} We find that the indictment, bill of particulars, and discovery provided a clear understanding of what the charges were, the alleged criminal conduct, and the specifics so that Hall could plan her defense. Moreover, the evidence adduced at trial supported each count of the indictment for which she was convicted.
 {¶ 67} Therefore, the third assignment of error is overruled.
 IV. Jurisdiction and Sufficiency of the Evidence {¶ 68} In the fourth assignment of error, Hall argues that the trial court erred in refusing to dismiss the charges when the "grand jury lacked jurisdiction" and there was insufficient evidence for the indictment or entry of conviction. *Page 23 
 a. Jurisdiction {¶ 69} R.C. 2901.11 grants jurisdiction to Ohio courts over criminal offenses that occur in Ohio. The statute provides that "[a] person is subject to criminal prosecution and punishment in this state if * * * the person commits an offense under the laws of this state, any element of which takes place in the state." R.C. 2901.11(A)(1). The statute expressly states that it "shall be liberally construed, consistent with constitutional limitations, to allow this state the broadest possible jurisdiction over offenses and persons committing offenses in, or affecting, this state." R.C. 2901.11(G).
 {¶ 70} The trial court heard oral argument on the issue of jurisdiction contemporaneously with the defendants' Rule 29 motions. In upholding jurisdiction, the trial court cited R.C. 2901.11(A)(5), which provides that a person is subject to criminal prosecution in Ohio if "[w]hile out of this state, the person unlawfully takes or retains property and subsequently brings any of the unlawfully taken or retained property into this state." The trial court also cited R.C. 2901.11(D), which provides that "when an offense is committed under the laws of this state, and it appears beyond a reasonable doubt that the offense or any element of the offense took place either in this state or in another jurisdiction or jurisdictions, but it cannot reasonably be determined in which it took place, the offense or element is conclusively presumed to have taken place in this state for purposes of this section."
 {¶ 71} We also find that jurisdiction was proper under R.C. 2901.11(F), which provides that "[a]ny act, conduct, or element that is a basis of a person being subject *Page 24 
under this section to criminal prosecution and punishment in this state need not be committed personally by the person as long as it is committed by another person who is in complicity or conspiracy with the person."
 {¶ 72} Hall incorrectly claims that the grand jury in this case did not have jurisdiction to indict her because all of her alleged crimes occurred outside of Ohio. She relies on R.C. 2939.08, which provides:
 "After the charge of the court of common pleas, the grand jury shall retire with the officer appointed to attend it, and proceed to inquire of and present all offenses committed within the county."
 {¶ 73} R.C. 2939.08 is not a jurisdictional statute; rather, it pertains to the duty of the grand jury. Although the statute broadly defines the duty of the grand jury, it does not govern its exclusive authority.
 {¶ 74} We also find support for jurisdiction in this case in Ohio's venue statute, R.C. 2901.12, which provides that "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." In recognizing the modern mobility of criminal offenders and the interest of judicial economy, the statute further provides:
 "(C) When the offense involved the unlawful taking or receiving of property * * *, the offender may be tried in any jurisdiction from which or into which the property * * * was taken, received, or enticed.
 "* * *
 "(G) When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, but it *Page 25 
cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those jurisdictions. "(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
 "* * *
 (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
 (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
 (4) The offenses were committed in furtherance of the same conspiracy.
 (5) The offenses involved the same or a similar modus operandi. * * *"
 {¶ 75} In State v. Ahmed, Cuyahoga App. No. 84220, 2005-Ohio-2999, we found no constitutional requirement that limits a grand jury from indicting only on offenses that occurred in the county in which it resides when the additional offenses presented are part of the same course of criminal conduct.
 {¶ 76} We stated that:
 "Article I, Section 10 of the Ohio Constitution provides that `no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury.' While we agree that the State was required to obtain an indictment from the grand jury on the offenses alleged, we find no constitutional requirement that limits a grand jury from indicting only on offenses that occurred in the county in which it resides when the additional offenses presented are part of the same course of criminal conduct. * * * Further, Article 4, Section 18 of the Ohio Constitution recognizes that Ohio courts shall `have and exercise such power and jurisdiction, at chambers, or otherwise, as may be directed by law.' Because R.C. 2901.12(A) recognizes that an offender who commits offenses in different jurisdictions as part of a course of criminal conduct may be tried in any one of *Page 26 
those jurisdictions, we find the same applies to the authority of the grand jury within those jurisdictions.
 {¶ 77} Accordingly, we find that a grand jury of one county has authority to indict on offenses occurring in other counties provided that those offenses are part of a course of criminal conduct. * * * [W]e find that constitutional, statutory, and case law impliedly authorize a grand jury to indict on offenses outside its county provided that such offenses are part of a course of criminal conduct involving the county where the grand jury resides. See R.C. 2901.11 and 2901.12(A); Art. 4, Sec. 18 Ohio Constitution."
 {¶ 78} Hall argues that Ahmed does not apply to the instant case because Hall's alleged criminal conduct occurred in another state, and our holding in Ahmed is limited to crimes that occur in other Ohio counties. We find this to be a distinction without a difference.
 {¶ 79} Because R.C. 2901.12 recognizes that an offender who commits offenses in different jurisdictions as part of a course of criminal conduct may be tried in any one of those jurisdictions, we find the same applies to the authority of the grand jury within those jurisdictions. As long as there was substantial evidence from which the trial court could have determined beyond a reasonable doubt that one of the alleged offenses was committed in Cuyahoga County as part of a course of criminal conduct, then this court must find that venue was properly established. See Ahmed. *Page 27 
 {¶ 80} Although much of Hall's involvement occurred in states other than Ohio, the conspiracy that made up the RICO charge clearly occurred in Ohio. Additionally, the count for receiving stolen property pertained to safety deposit boxes located in Ohio, which Hall attempted to access after her mother's arrest. As to the count for money laundering, we agree with the trial court that the basis for jurisdiction may be found within R.C. 2901.11(D).
 {¶ 81} Therefore, we find that the Cuyahoga County Common Pleas Court had proper jurisdiction over this case.
 b. Sufficiency of the Evidence {¶ 82} Hall also argues that her convictions for receiving stolen property and money laundering were not supported by sufficient evidence.
 {¶ 83} The standard of review for the sufficiency of evidence is set forth in State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus, which states:
 "Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
See, also, Apanovitch; State v. Davis (1988), 49 Ohio App.3d 109, 113,550 N.E.2d 966.
 {¶ 84} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52,678 N.E.2d 541 and State v. *Page 28 Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the State has met its burden of production at trial.Thompkins. On review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks, at paragraph two of the syllabus.
 {¶ 85} Hall was convicted of receiving stolen property, in violation of R.C. 2913.51, which states that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." R.C. 2913.51(A). She was also convicted of money laundering, in violation of R.C. 1315.55 (A)(1) and (4), which state that:
 {¶ 86} "No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity * * * [and/or] conduct or structure or attempt to conduct or structure a transaction that involves the proceeds of corrupt activity that is of a value greater than ten thousand dollars if the person knows or has reasonable cause to know that the transaction involves the proceeds of corrupt activity." *Page 29 
 {¶ 87} Hall alleges that she was convicted of crimes based on activity that could be construed as innocent acts.
 {¶ 88} We find that the State presented sufficient evidence to support her convictions. The evidence showed that she was a key holder to two of her mother's safety deposit boxes, and those boxes contained numerous items that were part of her mother's scheme. Hall argues that being a key holder does not mean that she knew the property was stolen. That statement is rebutted by evidence that Hall went to the bank with her mother to open the safety deposit boxes in 2004 and spent over thirty minutes placing items in the boxes, and then, after her mother was arrested, lied to bank employees about what happened to the keys, tried to get her mother's name removed from the box, and finally inquired about having the bank drill out the box so she could obtain the contents.
 {¶ 89} The State also presented sufficient evidence that Hall laundered the proceeds of her mother's stolen money. Both Bradley and Mobley testified that Hall had knowledge that her mother's money was illegitimate. And the evidence presented at trial shows Hall's direct involvement in managing her mother's money, directing the money into various investments, and that her mother gave her hundreds of thousands of dollars to invest or use when Hall had knowledge that her mother was on public assistance.
 {¶ 90} Therefore, the fourth assignment of error is overruled.
 V. Grand Jury Transcripts *Page 30 {¶ 91} In the fifth assignment of error, Hall argues that the trial court erred in refusing to grant her access to grand jury transcripts.
 {¶ 92} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v. Greer (1981), 66 Ohio St.2d 139,420 N.E.2d 982, syllabus, citing State v. Patterson (1971),28 Ohio St.2d 181, 277 N.E.2d 201, paragraph three of the syllabus. The trial court, in its discretion, determines whether the defendant has shown a particularized need for the production of grand jury proceedings.Greer, at 148.
 {¶ 93} Hall filed motions with the trial court seeking transcripts of the grand jury proceedings before and after trial. The court denied the motions but did conduct an in camera review of the grand jury transcripts and indicated that it would place a sealed copy of the grand jury testimony in the file before transmitting the record to this court.
 {¶ 94} Hall makes unsupported allegations that the State must have misled the grand jury into believing that Hall signed her mother's social security application when the evidence showed that Hall's signature was forged. First, we note that Hall was acquitted of the charges relating to the signatures. Second, at the time the grand jury was empaneled, Det. Duffy had a reasonable belief that the signatures belonged to Hall, because it was her name which appeared on the documents. It was only after indictment that Hall provided a handwriting sample, after which it was *Page 31 
determined that her signature was forged.[6] Thus, Hall cannot establish a particularized need to warrant the unsealing of the grand jury transcripts.
 {¶ 95} Finally, Hall's argument does not support the inference that the grand jury testimony contained undisclosed exculpatory material; we will not indulge a claim that rests merely upon speculation.
 {¶ 96} Therefore, the fifth assignment of error is overruled.
 {¶ 97} Accordingly, judgment is affirmed.
It is ordered that appellee recover of appellant the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, J., and JAMES D. SWEENEY, J.*, CONCUR.
[1] Joan filed her appeal in Case No. 90366 and Neff's appeal was designated Case No. 90132.
[2] After Hall was indicted, she submitted to a handwriting exemplar, which determined that it was not Hall who signed her name to her mother's social security documents. Hall was acquitted of the tampering with records counts in relation to these documents.
[3] Hall did not take part in the forfeiture hearing.
[4] Joan's counsel filed a motion to suppress statements and evidence, which the trial court denied after a full hearing.
[5] We note that Hall rested without presenting any evidence; thus, she made neither choice.
[6] It appears that once the State discovered that Hall did not sign the social security documents, it chose to proceed on a theory that Hall conspired with her mother because she was a payee of federal money. Again, Hall was acquitted of all counts relating to those documents.
* SITTING BY ASSIGNMENT: JUDGE JAMES D. SWEENEY, RETIRED, OF THE EIGHTH DISTRICT COURT OF APPEALS. *Page 1