[Cite as *State v. Parks*, 2020-Ohio-4524.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2019-L-097** |
| JABROWN R. PARKS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2018 CR 000757.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, *Jennifer A. McGee*, and *Eric J. Foisel*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, Ohio 44077 (For Plaintiff-Appellee).

*David N. Patterson*, P.O. Box 1423, Willoughby, Ohio 44096; *Eric J. Allen*, 4200 Regency Street, Suite 200, Columbus, Ohio 43219 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Jabrown R. Parks, appeals his convictions for aggravated burglary, attempted aggravated arson, and tampering with evidence. We affirm.

{¶2} In July of 2018, Jabrown, while wearing a motorcycle helmet, entered a bank in Willoughby carrying a can of gasoline. He demanded money and doused the counter and the tellers with gasoline. He left in a white Lexus. Police saw the car and a chase ensued. The Lexus lost the police but not before they secured the license plate

number. Police went to the residence listed for the registered owner of the car, who was Jabrown's brother. While staking out the residence, they learned that the white Lexus was found burning in a residential neighborhood. Moments later, a car pulled in the driveway, and Jabrown was the front seat passenger.

{¶3} After further investigation, Jabrown was charged with seven counts: aggravated burglary, robbery, attempted aggravated arson, two counts of tampering with evidence, and two counts of kidnapping. The jury found him guilty of all seven counts. The trial court merged counts two, six, and seven into count one, and count five into count four.

{¶4} Jabrown was sentenced to a total of 22 years in prison consisting of three consecutive sentences, including 11 years in prison for count one, aggravated burglary; eight years for count three, attempted aggravated arson; and 36 months for count four, tampering with evidence. He was ordered to serve five years post release control and pay restitution. Jabrown was also deemed a violent offender and an arson offender.

{¶5} Jabrown's first of five assignments of error contends:

{¶6} "[1.] The trial court erred in denying appellant's motion to suppress and allowing the appellee to present evidence against the appellant to the jury. (T.D. 40)."

{¶7} Jabrown's November 2018 suppression motion consists of four arguments: 1. the initial stop was illegal; 2. the allegedly incriminating statements Jabrown made at the scene before he was read his rights were the result of an illegal custodial interrogation; 3. upon being handcuffed and taken to the police station, he claims he was under arrest yet the police lacked probable cause for his arrest; 4. and the seizure of his cell phone and clothing was illegal.

2

{¶8} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." The Fourth Amendment. The basic purpose of the Fourth Amendment "'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018), quoting *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Ohio Constitution likewise protects against arbitrary government invasions. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997). The touchstone of both is reasonableness. *State v. Michael,* 10th Dist. Franklin No. 12AP-508, 2013-Ohio-3889, 995 N.E.2d 286, ¶ 10.

{¶9} "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

{¶10} "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement. *Athens v. Wolf*, 38 Ohio St.2d 237, 241, 313 N.E.2d 405 (1974)." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 17-18.

{¶11} Appellate courts review rulings on a motion to suppress under a mixed standard of review. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797

3

N.E.2d 71, ¶ 8. "[T]he trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* We must accept the trial court's findings of fact if they are supported by competent, credible evidence, and then independently decide whether those facts satisfy the applicable legal standards without deference to the trial court's decision. *Id.*

{¶12} The trial court overruled the suppression motion and found that the initial stop was a permissible investigatory stop during which the officers drew their guns and handcuffed the occupants of the car for officer safety. The court also found that Jabrown's statements during that initial stop, before he was read his rights, were not a result of an interrogation, and as such, *Miranda* is inapplicable. Further, the court found that although Jabrown was not under arrest, the officers had reasonable suspicion to believe he was involved in the bank robbery. Thus, his continued detention and transportation to the police department for questioning was warranted. As for the seizure of Jabrown's clothes and cell phone, the court found that the items were in plain view and were also seized under exigent circumstances to prevent the destruction of evidence. Finally, it found that although Jabrown was not under arrest that day, the police had probable cause to arrest him and seize his clothing and phone.

{¶13} Two witnesses testified at the suppression hearing. Willoughby Police Detective David Burrington testified he heard a radio call that there was a bank robbery, and the suspect fled in a white Lexus. The suspect was described as a thin male who was approximately six feet tall. The bank robber was wearing a motorcycle helmet when he entered the bank carrying a gasoline can. He doused the bank teller with gasoline and threatened to set her on fire.

4

{¶14} Burrington then learned that a Wickliffe Police Department officer saw the car, determined it was registered to Anthony Parks, and a high-speed chase ensued. The police did not catch the Lexus, but they relayed that the driver looked like the photo of the car's registered owner. Thus, Burrington went to Anthony Parks' home in an unmarked car with one of his sergeants, arriving about 30 minutes after the robbery.

{¶15} Sergeant Stewart drove and parked approximately five houses away so they could surveil Anthony's home. Soon thereafter, they saw a man, later determined to be Anthony, exit a car who was carrying a white Styrofoam cooler. Burrington said this individual did not match the description of the bank robber because the clothing did not match, and this person had a heavier build. This man went into the house, and they continued to surveil the home.

{¶16} Minutes later, Burrington learned that the white Lexus was found, and it had been set on fire. So, when another vehicle with dark tinted windows pulled into the driveway of the residence, Burrington and Stewart pulled up to it, drew their guns, and ordered the occupants to exit the vehicle. They used their guns because the robbery was violent in nature, and the officers were concerned for their safety since they could not see inside the car.

{¶17} Jabrown got out of the front seat passenger's side first. Ciara Smith was driving, and there were two small children in the car. This vehicle was also registered to Anthony Parks. Upon exiting, Jabrown immediately apologized to Ciara, stating he was sorry for getting her involved and asked her to say things to his family. Jabrown then directed Ciara to tell the police that she had picked him up from the rec center, which

5

Burrington perceived as an attempt to establish an alibi. Jabrown was handcuffed and placed in a police vehicle.

{¶18} Burrington estimated that he interviewed Ciara at the scene away from Jabrown at approximately 3:50 p.m., and the bank robbery took place at approximately 2:30 p.m. She told Burrington that she was Anthony's girlfriend and that he had called her to pick Jabrown up from the rec center. Anthony is Jabrown's brother. She then changed her story and told Burrington that she picked up Jabrown near Mayfield Road, and she showed Burrington her recent phone-call log to establish that she was telling the truth. She also said she had not seen Anthony since 11:30 a.m. that day when he left in the white Lexus.

{¶19} On cross-examination, Burrington agreed that the Wickliffe police had not mentioned there was a passenger in the car they had chased. He also explained that they did not stop the man carrying the cooler because at the time they were looking for individuals in a white Lexus.

{¶20} When asked why he assumed this second car was involved in the robbery, Burrington replied: "Because we had real time information that [the white Lexus] was just burned out. And we thought that obviously they're getting a ride from the scene."

{¶21} Further, after learning Jabrown's name at the stop, the police found out he was on federal probation for bank robbery.

{¶22} Detective Charles Krejsa also testified. He explained that the police transported Jabrown to the police department for questioning because they believed he was involved in the robbery. They placed his wallet and cell phone in the front seat, and Jabrown was handcuffed and placed in the backseat.

{¶23} Upon arriving at the police station, officers advised him of his Miranda rights, and Jabrown eventually said he wanted a lawyer.

{¶24} Police also received still images from a Family Dollar's security footage from near where the car was found burning. The images depict two men buying a white cooler, and one of them placing a black bag inside it. The clerk told police that the men smelled like gasoline. Jabrown was wearing clothes that looked like those depicted in the images, so the police took his clothes. He was wearing a white t-shirt, dark sweatpants with a distinctive loop, dark shoes with zippers, and a large decorative watch. Police also took his cell phone. They gave him an orange jumpsuit to wear, put him in the lobby, and told him to get a ride home. They told him that he had to return the jumpsuit or have a friend bring him clothes to change into before leaving. Police did not search his phone until after they secured a warrant.

The initial stop

{¶25} Jabrown contends there was no probable cause for the officers to order the occupants from the car with guns drawn. He argues there was no traffic violation or indicia of criminal activity warranting his seizure, and as such, the trial court should have suppressed any evidence obtained as a result of the stop.

{¶26} There is no doubt that Jabrown was seized for Fourth Amendment purposes when the officers ordered him out of the car with guns drawn. Yet, he argues that the officers lacked the necessary, objectively reasonable suspicion necessary to justify the stop. We disagree.

{¶27} In a constitutionally valid investigatory stop, the police involved "'must be able to point to specific and articulable facts which, taken together with rational inferences

7

from those facts, reasonably warrant that intrusion * * *.' *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 * * *.'" *State v. Evans*, 67 Ohio St.3d 405, 408, 1993-Ohio-186, 618 N.E.2d 162 (1993).

{¶28} "In *Terry,* the United States Supreme Court held that a police officer may stop and investigate unusual behavior, even without probable cause to arrest, when he reasonably concludes that the individual is engaged in criminal activity. In assessing that conclusion, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' *Id.* at 21, 88 S.Ct. at 1880. Furthermore, the standard against which the facts are judged must be an objective one: '[W]ould the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22, 88 S.Ct. at 1880. * * * [A]n objective and particularized suspicion that criminal activity was afoot must be based on the entire picture—a totality of the surrounding circumstances. * * * Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold. * * * A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶29} In *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132 (2019), *cert. denied,* 140 S.Ct. 390, 205 L.Ed.2d 219, the officer heard the sound of gunshot nearby; knew he was in a high crime area; the stop occurred after dark; and it occurred in very close proximity, approximately one minute after the shots were heard;

8

and the defendant was the only person in the area. The Ohio Supreme Court upheld the denial of the motion to suppress finding the investigatory stop valid because the officer had specific, articulable suspicion, together with rational inferences from those facts, reasonably warranting the intrusion. The *Hairston* court found the officers did exactly what was expected of them, finding it was reasonable and prudent of the police to see if Hairston was the source of gunfire or had information about the gunfire. *Id.* at ¶ 18. The court likewise found it was reasonable for officers to approach Hairston with their guns drawn since the sound of gunfire made it reasonable for them to fear for their safety, and police drawing their guns under these circumstances does not convert the stop to an arrest. *Id.* at ¶ 20.

{¶30} Here, the police were staking out a residence identified as the home of the owner of the Lexus, the vehicle used in the robbery, who Burrington believed was the bank robber and had an hour earlier doused a bank teller with gasoline before leading the police on a high-speed chase. The Wickliffe police had relayed that the driver looked like the registered owner. After losing the police, the driver abandoned the car, and it was found burning in a residential backyard in a nearby town. When the car transporting Jabrown arrived at the residence, police could not see inside the car due to a heavy window tint. The officers determined that an investigative detention of the occupants was appropriate. Based on the facts known to them, the officers had an objectively reasonable and particularized suspicion that justified the investigative seizure to determine whether the occupants of the car were involved with the robbery. Thus, Jabrown's initial detention in the driveway for an investigatory stop was objectively reasonable since stopping the car to investigate the robbery soon after the car involved in the high-speed chase was

9

found burning was what reasonable and prudent officers would do under the circumstances.

{¶31} Moreover, based on Burrington's testimony, the officers' brandishing of their weapons was a reasonable safety precaution at this juncture because they were seeking suspects after a violent robbery and high-speed chase, and they could not see into the car to determine who was inside or whether the occupants were armed. *Hairston, supra*, quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675 (1985) ("Police officers may take steps that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a] stop.'"). And in light of their legitimate safety concerns, the officers showing their weapons did not convert the stop into an arrest. *Id. at* ¶ 21.

Continued detention

{¶32} Jabrown also argues that he should have been let go and that he was essentially under arrest when police continued his detention once they learned that he was not Anthony Parks, the owner of the white Lexis. Instead, Jabrown was handcuffed and placed in the back of a police car and driven to the police station for questioning.

{¶33} "'If during the scope of the initial stop an officer encounters additional specific and articulable facts which give rise to a reasonable suspicion of criminal activity beyond that which prompted the stop, the officer may detain the vehicle * * * for as long as the new articulable and reasonable suspicion continues.'" *State v. Carter,* 11th Dist. Portage No. 2003-P-0007, 2004-Ohio-1181, ¶ 34, quoting *State v. Waldroup,* 100 Ohio App.3d 508, 513 (12th Dist.1995). Whether the continued seizure was reasonable is

10

analyzed under the totality of the circumstances. *State v. Bobo,* 37 Ohio St.3d 177, 178 (1984)." *State v. Jackson*, 11th Dist. Lake No. 2011-L-107, 2012-Ohio-2123, ¶ 28.

{¶34} In *Jackson*, *supra*, we upheld a continued detention following an investigatory stop. There, the driver told officers that the passenger had drugs on him. This statement coupled with the passenger's furtive movements were sufficient to provide further reasonable suspicion to detain the occupants to investigate.

{¶35} According to Burrington, Jabrown, while exiting the car, made incriminating statements, by telling Ciera that he was sorry. Burrington testified that Jabrown also directed Ciara to tell the police that she had just picked him up from the rec center. Burrington perceived this as an attempt by Jabrown to establish an alibi. Further, Burrington said that Jabrown fit the physical description of the suspect as a thin male who was approximately six feet tall and that during his initial detention, the police also learned that Jabrown was on federal probation for bank robbery. These facts collectively provided the police with reasonable suspicion to further detain Jabrown to continue their investigation. *State v. Spindler*, 4th Dist. Ross No. 01CA2624, 2002-Ohio-2037, *4, quoting *State v. Robinette* (1997), 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (If an officer during an investigative stop ascertains "reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.").

Incriminating statements

{¶36} Jabrown complains that his incriminating statements to Ciara while exiting the car were obtained when he had not yet been Mirandized, and as such, should have been suppressed.

11

{¶37} "*Miranda* warnings must be provided when a defendant is subject to a custodial interrogation. [*Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).] A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' *Id. at* 444, 86 S.Ct. 1602." *State v. Ferrell*, 11th Dist. Portage No. 2017-P-0018, 2017-Ohio-9341, 91 N.E.3d 766, ¶ 27.

{¶38} "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Under *Miranda*, an interrogation includes not only express questioning, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response * * *." *Innis, supra*.

{¶39} Miranda warnings are required and apply "when a suspect is subjected to both custody and interrogation." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119.

{¶40} Here, Burrington described Jabrown telling Ciara that he was sorry and telling her to say things to his family while he was exiting the vehicle. He also instructed her to tell police that she had picked him up from the rec center. Regardless of whether Jabrown was in custody at the moment of these incriminating statements, there is nothing evidencing that his statements were a result of police questioning. Because Jabrown's statements were not the result of police questioning or interrogation, *Miranda* warnings were not required. *Id.*

12

Seizure of cell phone and clothing

{¶41} Finally, Jabrown contends that the police unlawfully seized his cell phone and clothing at the station in violation of the Fourth Amendment. Police did not search his cell phone until after obtaining a warrant but claimed they seized it and his clothes to prevent the destruction of evidence. The trial court found, in part, that the items were lawfully seized since the officers had probable cause to arrest Jabrown at the time these items were taken.

{¶42} One exception to the warrant requirement is a search incident to an arrest, which allows law enforcement to discover weapons and seize evidence to prevent its destruction. *State v. Dingess*, 10th Dist. Franklin No. 01AP-1232, 2002-Ohio-2775, ¶ 9, citing *State v. Mathews*, 46 Ohio St.2d 72, 346 N.E.2d 151 (1976) and *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

{¶43} "[A] police officer has reasonable or probable cause to arrest when the events leading up to the arrest, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause. *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Moreover, probable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense. *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)." *State v. O'Neill*, 3d Dist. Allen No. 1-14-21, 2015-Ohio-815, 29 N.E.3d 365, ¶ 38.

{¶44} In determining whether the police had probable cause to arrest an individual, appellate courts consider whether police at the moment of the arrest had sufficient information derived from a reasonably trustworthy set of facts to cause a prudent

13

person to believe that the suspect committed an offense. *State v. Brooks*, 11th Dist. Lake No. 2011-L-049, 2013-Ohio-58, ¶ 27, citing *State v. Wojewodka,* 11th Dist. Portage No. 2009-P-0029, 2010-Ohio-973, ¶ 18. This determination is based on the totality of the facts and circumstances at the time. *Brooks*, *supra*. "And whether there was probable cause to arrest is a legal issue that we review de novo." *State v. Raybould*, 11th Dist. Portage No. 2018-P-0085, 2019-Ohio-3057, ¶ 23, citing *Columbus v. Horton*, 10th Dist. Franklin No. 13AP-966, 2014-Ohio-4584, ¶ 13.

{¶45} Here, the facts and circumstances within Burrington's knowledge were sufficient to warrant a reasonable belief that Jabrown committed the bank robbery or had aided or abetted another in committing the robbery, burning the car, or both. Jabrown was the brother of the owner of the Lexus that was seen leaving the scene of the robbery; that was involved in a high-speed chase; and that was later found ablaze. Further, Jabrown met the physical description of the robber, and his clothes matched the clothes depicted on the person in the images taken from the dollar store near where the Lexus was found burning. Moreover, the clerk described the men as smelling of gasoline. The men purchased a Styrofoam cooler that Burrington later saw another individual carrying into Anthony's home before Jabrown arrived. And when ordered from the car, Jabrown apologized to Ciara for getting her involved and told her to tell police that she had picked him up from the rec center, which Burrington believed was an effort to establish an alibi. Upon learning Jabrown's name, police also learned he was on federal probation for bank robbery.

{¶46} Based on the totality of the facts and circumstances, when police seized Jabrown's cell phone and clothing at the station, they had sufficient information derived

14

from a reasonably trustworthy set of facts to cause a prudent person to believe that Jabrown committed an offense. Consequently, the seizure of his clothes and phone was not illegal. *State v. Terrell*, 8th Dist. Cuyahoga No. 80676, 2002-Ohio-4913, ¶ 30, citing *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("the actual arrest need not precede the search as long as the fruits of the search are not used to support probable cause for the arrest."). Thus, we need not address the other reasons provided by the trial court as to why the seizure of Jabrown's phone and clothing was proper.

{¶47} And because the police did not search the phone until after securing a warrant, the case Jabrown relies on is inapplicable. *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 29 (holding a warrantless search of "cell phone [data] seized incident to a lawful arrest is prohibited by the Fourth Amendment when the search is unnecessary for the safety of law-enforcement officers and there are no exigent circumstances").

{¶48} Accordingly, each of Jabrown's arguments under his first assigned error lacks merit.

{¶49} We address his second and third assigned errors collectively, which contend:

{¶50} "[2.] The appellant's convictions on each and all counts were based upon insufficient evidence and were otherwise against the sufficient and/or manifest weight of the evidence and not beyond a reasonable doubt contrary to Ohio law and the state and federal constitutions. (T.d. 212).

15

{¶51} "[3.] The trial court erred in not granting the appellant's motion on all counts for acquittal and renewed motion pursuant to Rule 29 of the Ohio Rules of Criminal Procedure and Ohio and federal law and constitutions. (T.d. 212)."

{¶52} In the second assigned error Jabrown challenges his convictions as against the manifest weight of the evidence and based on insufficient evidence.

{¶53} When an appellate court finds that a defendant's conviction is supported by the weight of the evidence, this conclusion includes a finding that sufficient evidence supports the conviction. *State v. Smith*, 11th Dist. Portage No. 2016-P-0074, 2018-Ohio-4799, ¶ 53, *motion for delayed appeal granted,* 155 Ohio St.3d 1411, 2019-Ohio-1205, 120 N.E.3d 30, and *appeal not allowed,* 156 Ohio St.3d 1452, 2019-Ohio-2780, 125 N.E.3d 947, and *appeal not allowed,* 157 Ohio St.3d 1564, 2020-Ohio-313, 138 N.E.3d 1165.

{¶54} "In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *See State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*" *State v. Carter*, 7th Dist. Mahoning No. 15 MA 0225, 2017-Ohio-7501, 96 N.E.3d 1046, ¶95, *appeal not allowed,* 151 Ohio St.3d 1515, 2018-Ohio-365, 90 N.E.3d 952.

{¶55} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns 'the

16

inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*' (Emphasis added.) [Black's Law Dictionary (6 Ed.1990) ], at 1594.

{¶56} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. * * * *See, also*, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." *Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶57} "The trier of fact is free to believe all, part, or none of the testimony of any witness, and we defer to the trier of fact on evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. * * *." *State v. Miller*, 4th Dist. Hocking No. 18CA3, 2019-Ohio-92, ¶ 28.

17

{¶58} As for a motion for acquittal, it likewise tests the sufficiency of the evidence and is reviewed under the same standard of review as arguments challenging the sufficiency of the evidence. *State v. Smith*, 6th Dist. Erie No. E-05-090, 2006-Ohio-5101, ¶ 9, citing *State v. Thompson*, 127 Ohio App.3d 511, 525 (8th Dist.1998).

{¶59} As stated, Jabrown was convicted of count one, aggravated burglary a first-degree felony in violation of R.C. 2911.11(A)(1); count three, attempted aggravated arson a second-degree felony in violation of R.C. 2923.02 and 2909.02(A)(2), and count four, tampering with evidence a third-degree felony in violation of R.C. 2921.12(A)(1).

{¶60} Count one charged that Jabrown entered the bank to commit a criminal offense and while therein threatened to inflict physical harm on a bank employee in violation of R.C. 2911.11(A)(1), which sets forth the offense of aggravated burglary:

{¶61} "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

{¶62} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another * * *."

{¶63} Count three charged Jabrown with attempted aggravated arson for dousing the bank with gasoline and by means of fire knowingly creating a substantial risk of harm to another person in violation of R.C. 2909.02 (A)(1) and (2), aggravated arson, which states:

{¶64} "No person, by means of fire or explosion, shall knowingly do any of the following: * * * [c]reate a substantial risk of serious physical harm to any person other than the offender * * * [or] * * *[c]ause physical harm to any occupied structure * * *." And R.C. 2923.02(A) attempt states: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶65} Last, he was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1):

{¶66} "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

{¶67} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *."

{¶68} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶69} Jabrown expressly states he is not challenging the elements of each of the three offenses but limits his argument as challenging his identification as the bank robber. His acquittal argument is likewise limited to his alleged misidentification. Further and although not necessarily a sufficiency or manifest weight argument, his other argument herein challenges the introduction of the cell site tracking data. Jabrown claims the state

failed to show the phone number in question was his and that the court erred in admitting this evidence without expert testimony.

{¶70} Brittany Carter testified for the state. She is a personal banker who was working as a teller on the date of the robbery when a man entered the bank wearing a motorcycle helmet carrying a gas can. He threw bags soaked with gas at Brittany and her coworker and instructed them to fill the bags with fifties and hundreds. He told them not to give him any tracers or dye packs, which made her believe he knew what he was talking about. He was telling them to hurry up while dousing the counter and the bank employees with gasoline. She thought he was going to light them on fire. The helmet covered his face, and when he lifted the face shield, he was wearing goggles underneath. Brittany recalls seeing that he had darker skin. The man was about 5'8" tall and had a thinner build. She also relayed that the bank was unable to open next day due to the overwhelming smell of gasoline, which required extensive cleaning.

{¶71} Tammy Kessler, the other bank employee present, testified that she asked the person entering the bank to remove his helmet, but he did not comply. He was also wearing black gloves. She said the man kept demanding more money and was shaking gasoline all over the bank. He threw bags at them that smelled like gasoline. He was later crouching down below the counter, and they could not see what he was doing. The man left the bank with nearly $10,000.

{¶72} Patrolman Kristen Finch from the Wickliffe Police Department testified that she was patrolling on July 2, 2018 and was stationary on 90 westbound when she heard a call about a white Lexus involved in a bank robbery. She saw the car and that the driver was a black male wearing sunglasses. She could not see if there was more than one

20

person inside the car because the windows were tinted. She tried to stop the vehicle, but it did not stop, and a chase ensued. Finch eventually lost the car.

{¶73} Detective Dan Moreland of the Wickliffe police department was in an unmarked police car when he heard the call about the white Lexus. He saw the car and relayed its license plate number. He watched Finch try to stop the vehicle before a chase ensued that reached 100 miles per hour. Moreland saw the driver and subsequently identified him as Anthony Parks based on the photo of the registered owner of the car.

{¶74} Detective David Demario from the South Euclid Police Department testified that he responded to a call about a fire. When he arrived at the residence, he saw that a white Lexus had been on fire in a residential area, but the fire department had already extinguished it before he arrived. There was a strong smell of gasoline emanating from the car.

{¶75} A woman who lived near the bank recalls a white Lexus nearly hitting her at her apartment complex that day. She said the car stopped and a person wearing a black ski mask got in the passenger's side door before they drove away.

{¶76} Jacqueline Freeman testified that she worked at Family Dollar in July of 2018 when a man came in and purchased a cooler. It was store policy to look inside any containers sold, and upon looking inside the cooler, Freeman saw a black bag and smelled gasoline. The black bag was not Family Dollar merchandise. The man then asked Freeman where he was located, and she told him that he was at the intersection of Monticello and Green, which the customer relayed to someone on the phone.

{¶77} Several area businesses' surveillance cameras captured images of the men that day and depicted the two men crossing the street toward the dollar store.

{¶78} Ciara Smith testified that she was dating Anthony in July of 2018. Anthony is Jabrown's brother. Anthony had two phones at the time, one for business and one for personal calls. Anthony called her on July 2, 2018 saying that Jabrown needed a ride, which is not unusual. Ciara picked Jabrown up near an apartment complex near Monticello and drove him to his grandmother's house in Cleveland. When they pulled in, they were stopped by police with their guns drawn. After exiting the car, Jabrown told her to tell his wife that he was sorry.

{¶79} Ciara initially told Detective Burrington that she picked up Jabrown from the rec center on Miles Road. She also identified Anthony's two phone numbers and Jabrown's number.

{¶80} Sergeant Derrick Stewart of the Willoughby Police Department, along with Burrington, headed to the home address listed for the registered owner of the car and parked a few houses away. They saw a man get dropped off there carrying a white Styrofoam cooler. Police did not stop this man since they were not sure which home he was going to, and they had not yet learned that the white Lexus was destroyed.

{¶81} After hearing that the white Lexus they were looking for was on fire, Stewart and Burrington agreed to stop the next vehicle that approached the home. About ten minutes later, a dark Chrysler with heavily tinted windows pulled in the driveway. Stewart blocked it in with his unmarked car, and he and Burrington ordered the occupants to exit the car. Jabrown exited with his hands up and, at about the same time, told the driver he was sorry. Jabrown also told police his name and that this was his aunt's home.

{¶82} Ben Jurevicius, Jabrown's federal probation officer testified that he knew Jabrown. Jurevicius identified the man in the surveillance footage as Jabrown, explaining

22

that the person depicted has the same facial features as Jabrown, and he was wearing the same eyeglasses and hat that Jabrown frequently wore.

{¶83} Kimberly Cummings testified that she knows Anthony Parks, and she identified him for the Willoughby police in Family Dollar footage. She described Anthony as having a heavier build. He was the person carrying the cooler. The footage was played for the jury, and she identified Anthony at trial. Cummings did not know Jabrown.

{¶84} David Green, the trace evidence supervisor at the Lake County Crime Lab, tested several items and compared them to hair samples taken from Anthony and Jabrown. One hair found in the helmet was consistent with Jabrown's sample. Green also confirmed that gasoline was present on Jabrown's clothing taken from him on the day of the robbery.

{¶85} David Burrington testified that he was with Stewart on the day of the robbery. They were headed to the bank when they learned the address listed for the owner of the suspect's car, so they headed to this address in Cleveland. They sat outside the house a few houses away and watched as a heavyset man got dropped off there, who was carrying a smaller white cooler. They did not stop him since the photos they received of the robbery suspect depicted someone with a thinner build.

{¶86} Ten minutes later, a different car pulled into the driveway. They decided to stop this car. The officers ordered the occupants out, and Jabrown got out first and was immediately apologizing to the driver, Ciara Smith. Two young children were in the backseat, and they were sent inside the home. Police patted down Jabrown and had him sit on the curb. Jabrown told Ciara to tell the police that she had just picked him up from the rec center, which Burrington perceived as an attempt to establish an alibi.

23

{¶87} Burrington recalls Ciara asking to talk with him in private so that Jabrown could not hear her. She showed him her phone that indicated that he had called her. They took Jabrown to the station and eventually took his shoes, shirt, and pants as evidence. Police also found a motorcycle helmet on the rooftop of a nearby business. The face shield had been painted.

{¶88} Burrington said they looked into Ciara as a suspect, but the evidence did not lead them to believe she was involved based on her phone records.

{¶89} Detective Lieutenant James Shultz and his detectives later found the motorcycle helmet, which had been thrown on top of a nearby building. They also received footage from a home depicting a man exit the front passenger side of a white Lexus sedan and carrying a gas can.

{¶90} The South Euclid Fire Department arrived quickly and extinguished the fire before the car was completely burned. A gas can spout was found with the burning car near the passenger's side. The heat from the car fire melted the siding on the garage on South Green. A pour pattern from the gasoline was evident on the lid of the trunk.

{¶91} Several cell phone company representatives testified about phone numbers linked to Anthony, Ciara, and Jabrown and confirmed the authenticity of the data. They also confirmed that the phone number linked to Jabrown was a prepaid tracphone, which cell phone companies have no record of the owner's information. Ciara verified the number as Jabrown's.

{¶92} Officer Kevin Rastall provided lay testimony, after the defense objection was overruled, about cell site location data. Rastall used a computer program to plot and map the activity for the phone numbers associated with Jabrown, Ciara, and the two phones

24

linked to Anthony for the date of the robbery. The state played a video Rastall created that mapped the location of the cellular towers used by their phones. It was consistent with the crime that day. The data from the cellular phone company that was linked to Jabrown and that Rastall plotted on the map places Jabrown's phone in Willoughby at the time of the robbery. The data shows that Anthony and Jabrown left their aunt's home, went to Willoughby, and then returned to their aunt's home in Cleveland.

{¶93} As stated, Jabrown argues the trial court erred in permitting the state to offer lay testimony regarding this cell site mapping analysis. He claims he was denied the opportunity to test the veracity and accuracy of the software and Rastall's testimony, which he contends was expert testimony. The trial court found the state was offering Rastall as a lay witness.

{¶94} The admission or exclusion of evidence is a matter left to the trial court's sound discretion and will not be disturbed absent an abuse of discretion. *State v. Dunn,* 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 40.

{¶95} "'[T]he term abuse of discretion' is one of art, connoting judgment exercised by a court, which does not comport with reason or the record.' *State v. Underwood,* 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶ 30, citing *State v. Ferranto,* 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). * * * an abuse of discretion is the trial court's 'failure to exercise sound, reasonable, and legal decision-making.' *State v. Beechler,* 2d Dist. No. 09-CA-54, 2010-Ohio-1900, 2010 WL 1731784, ¶ 62, quoting Black's Law Dictionary (8 Ed.Rev.2004) 11. When an appellate court is reviewing a pure issue of law, 'the mere fact that the reviewing court would decide the issue differently is enough to find error (of course, not all errors are reversible. Some are harmless; others are not preserved for

25

appellate review). By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error.' *Id.* at ¶ 67." *Ivancic v. Enos*, 11th Dist. Lake No. 2011-L-050, 2012-Ohio-3639, 978 N.E.2d 927, ¶ 70.

{¶96} The admission of lay testimony is governed by Evid.R. 701, which states:

{¶97} "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶98} Here, the records associated with Jabrown's, Anthony's and Ciara's cell phone were admitted without objection, and Rastall used a computer program to track the location of the cellular towers used by Jabrown's phone in relation to locations relevant to the crimes to show that Jabrown was in the area where the offenses were committed.

{¶99} The trial court found that although Rastall has a level of expertise, a high degree of expertise is not required to generate a map based on admitted cell phone records, and as such, it was lay testimony. We agree.

{¶100} The Supreme Court of Ohio has addressed a comparable case and held that a drug user is competent to provide lay testimony as to her opinion of the identity of a controlled substance or drug. *State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-41, 744 N.E.2d 737. The *McKee* court explained that the experience and knowledge of a drug user lay witness can establish her competence to express an opinion on the identity of a controlled substance if a foundation for this testimony is established. This type of lay testimony meets the requirements of Evid.R. 701 because it "is testimony rationally based

on a person's perceptions and helpful to a clear understanding of a fact in issue." *McKee, supra.* On the other hand, expert testimony involves testimony resulting from reasoning that can only be mastered by specialists in the field. *Id.*

{¶101} "Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience." (footnote omitted.) *Id* at 297.

{¶102} Moreover, this court has previously addressed this precise issue and concluded that evidence relayed regarding the mapping of cell site data is capable of being generally performed by a layperson, and thus, it does not require an expert to testify. *State v. Perry,* 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, 2012 WL 5195814, ¶ 65; *accord State v. Johnson*, 8th Dist. Cuyahoga No. 105612, 2018-Ohio-1389, 110 N.E.3d 800, ¶ 26-27, *appeal not allowed,* 153 Ohio St.3d 1462, 2018-Ohio-3258, 104 N.E.3d 792; *State v. Daniel*, 8th Dist. Cuyahoga No. 103258, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 68 (finding a layperson is capable of comparing locations depicted in authenticated phone records to the corresponding location on a map).

{¶103} Thus, the trial court did not abuse its discretion by permitting Rastall's testimony and relaying his cell site tracking of Jabrown's, Anthony's, and Ciara's mobile phones.

{¶104} Jabrown's phone showed he was in the area of the bank at the time of the robbery, and he was positively identified after the car was found burning as one of the

27

men in a dollar store who smelled of gasoline while purchasing a cooler. Moreover, Jabrown was the thinner of the two men, and thus his physical traits match the description given by the bank employees. Further, his hair was consistent with a hair found in the helmet, and his clothes had gasoline on them. Finally, when exiting the car, Jabrown was heard apologizing to Ciara and instructing her what to tell the police.

{¶105} In light of the foregoing, the state presented sufficient, credible evidence showing that Jabrown, along with his brother Anthony, robbed the bank in Willoughby while dousing it with gasoline. In an effort to conceal evidence of the crime, the two then threw the helmet on a nearby roof and lit the Lexus on fire.

{¶106} We disagree that the state failed to establish Jabrown's identification as the bank robber. A hair consistent with his was found in the helmet and his probation officer identified him as one of the two men in the surveillance footage. Moreover, he was thinner than his brother and his build matched the bank employees' description and his clothing was consistent with the images. And because Jabrown limits his arguments herein to his identification, we do not review the elements for each of his three convictions.

{¶107} Accordingly, Jabrown's second and third assigned errors lack merit.

{¶108} His fourth assigned error asserts:

{¶109} "[4.] The appellant was denied due process by a sentence contrary to Ohio law and the state and federal constitutions including maximum prison terms and an order that all counts be served consecutively and ordering appellant to register."

{¶110} Our review of sentencing issues is dictated by R.C. 2953.08(G)(2), which states:

28

{¶111} "(2) The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

{¶112} "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. *The appellate court's standard for review is not whether the sentencing court abused its discretion.* The appellate court may take any action authorized by this division *if it clearly and convincingly finds either of the following*:

{¶113} "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

{¶114} "(b) That the sentence is otherwise contrary to law." (Emphasis added.)

{¶115} Jabrown makes three arguments under this assigned error. First, he contends it erred in imposing consecutive sentences. Second, he argues the court erred in failing to conduct a proportionality analysis under R.C. 2929.11(B). Third, Jabrown claims he was not permitted to speak at the sentencing to contest his prior offenses.

{¶116} Although this assigned error states in part that he is assigning as error the court's order requiring him to register, he provides no law or argument in support of this contention. He does not even include a conclusory statement regarding this point in the body of his brief.

{¶117} App.R. 16(A)(7) requires an appellant's brief to include "[a]n argument containing the contentions of the appellant with respect to each assignment of error

presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Because this contention is unsupported, we will not construct this argument for him, and this aspect of his assigned error is overruled. *Byers DiPaola Castle v. Ravenna City Planning Comm.*, 11th Dist. Portage No. 2010-P-0063, 2011-Ohio-6095, ¶ 35 (disregarding conclusory arguments unsupported in appellant's brief).

{¶118} As stated, Jabrown claims the court erred in imposing consecutive sentences.

{¶119} The imposition of consecutive prison terms for multiple felony offenses is governed by R.C. 2929.14(C)(4), one provision listed in R.C. 2953.08(G)(2)(a). Thus, we must affirm the imposition of consecutive terms unless we clearly and convincingly find that the record does not support the trial court's findings under R.C. 2929.14(C)(4), which states:

{¶120} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

{¶121} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

{¶122} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶123} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

{¶124} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37.

{¶125} Here, the trial court found all the prongs satisfied and made the requisite findings at the sentencing hearing. The court also made specific findings in its sentencing decision, stating:

{¶126} "[T]he court finds for the reasons stated on the record that consecutive sentences are necessary to protect the public from future crime or to punish the Defendant and are not disproportionate to the Defendant's conduct and the danger the Defendant poses to the public, and that the Defendant committed one or more of the multiple offenses while on bond and under post-release control for a prior offense, and that at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed by

the Defendant was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the Defendant's conduct, and the Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the Defendant."

{¶127} Although not required to state its reasons, the court's reasons were well established at the hearing. Jabrown was on federal probation for bank robbery at the time of this offense as well as on bond for another pending robbery case. He did not show remorse or apologize at sentencing for his course of conduct but seemed to complain that he was taking the blame for these offenses. Further, the trial court found he was the principal offender since he committed the acts of violence by dousing the bank employees with gasoline during a robbery, who feared for their lives and suffered serious psychological harm. The court also emphasized that the bank suffered serious economic harm since the stolen $9,793 was never returned, and the bank had to close for extensive cleaning.

{¶128} There is no evidence to the contrary, and in the absence of conflicting evidence, Jabrown fails to clearly and convincingly demonstrate that the court's findings under R.C. 2929.14(C)(4) are unsupported. *State v. Rangel*, 11th Dist. Lake No. 2015-L-119, 2016-Ohio-7148, ¶ 30.

{¶129} Second, Jabrown argues the trial court failed to conduct a proportionality review as required by R.C. 2929.11(B), which states:

{¶130} "A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * * commensurate with and not

demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶131} R.C. 2929.11(B) sets forth the basic principles of felony sentencing. Although a sentencing court is required to engage in the analysis set forth by R.C. 2929.11(B) to ensure the consistency of sentences, it does not require findings.

{¶132} Notwithstanding, the court states at the sentencing hearing that it considered the purposes and principles of sentencing set forth in R.C. 2929.11 and that upon fashioning the sentence, it made an effort "to be consistent with sentences imposed for similar crimes committed by similar offenders."

{¶133} Thus, this aspect of this assigned error lacks merit.

{¶134} Finally, contrary to his third argument under this assigned error, the sentencing hearing does not depict Jabrown being interrupted or denied the opportunity to speak. Instead, he spoke on his own behalf without interruption, and at the conclusion of the hearing, the court asks the parties if there is anything they want to add, and both sides said no. Thus, this aspect of his assigned error lacks merit.

{¶135} Based on the foregoing, he has failed to establish any error, and his fourth assignment lacks merit.

{¶136} Jabrown's fifth assigned error contends:

{¶137} "[5.] The appellant was denied the effective assistance of counsel contrary to Ohio law and the state and federal constitutions due to his ineffective assistance of trial counsel (Transcript of the proceedings T.d. 212)."

{¶138} "To prevail on his ineffective-assistance claims, [appellant] must demonstrate both that 'counsel's representation fell below an objective standard of

33

reasonableness' and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, [appellant] must show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed [him] by the Sixth Amendment.' *Id.* at 687, 104 S.Ct. 2052. And to establish prejudice, he must show 'that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.' *Id."* *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634.

{¶139} Here, Jabrown gives two conclusory statements contending his trial counsel was deficient. First, he claims his attorney failed to object throughout trial when he told him to do so. Second, he claims his attorney failed to present an expert to challenge the state's cell site mapping testimony. Neither argument is supported by references to the record nor applicable law.

{¶140} As stated, it is not this court's function to formulate an appellant's arguments on appeal. *State v. Hall*, 8th Dist. Cuyahoga No. 90365, 2009-Ohio-461, ¶ 40; *State v. Hull*, 11th Dist. Lake No. 2019-L-126, 2020-Ohio-2895, ¶ 49. Thus, this assignment of error lacks merit since it fails to comply App.R. 16(A)(7). *Byers DiPaola Castle, supra.*

{¶141} Notwithstanding, we note that Jabrown does not point to any issues or testimony where an objection was warranted at trial but not raised. Further, objections are typically matters of trial strategy reserved for trial counsel to decide, not the defendant. *State v. Brown*, 5th Dist. Stark No. 2007 CA 15, 2008-Ohio-3118, ¶ 58 (stating that failure to object to prosecutor's statements during closing arguments may have been trial strategy and thus did not constitute deficient performance); *State v. Mundt*, 115

Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 90 (suggesting a trial attorney might forgo objecting to minimize jury attention to damaging material).

{¶142} As for Jabrown's claim that his attorney should have presented opposing expert testimony, even if he had detailed this argument for our review, we could not address it because it likely relies on evidence not in the record. *State v. McNeill*, 137 Ohio App.3d 34, 40, 738 N.E.2d 23 (9th Dist.2000) (direct appeals limited to the trial court record); *Morgan v. Eads,* 104 Ohio St.3d 42, 2004-Ohio-6110, 818 N.E.2d 1157, ¶ 13 ("a bedrock principle of appellate practice * * * is that an appeals court is limited to the record of the proceedings at trial").

{¶143} Based on the foregoing, Jabrown's fifth assigned error lacks merit.

{¶144} The trial court's judgment is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MARY JANE TRAPP, J.,

concur.